ORIGINAL

# 16324



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

NOV – 5 2007

CLERK, U.S. DISTRICT COURT

By _____
Deputy

GENERAL PARTS, INC., §
§
    Plaintiff, §
§
VS. §
§
INTERNET AUTOPARTS, INC., §
§
    Defendant. §

CIVIL ACTION NO.

**3 07 CV 1840 - P**

## ORIGINAL COMPLAINT

Plaintiff General Parts, Inc. ("GPI") files this, its Original Complaint, against Internet

Autoparts, Inc. ("IAP") and, in support thereof, would respectfully show the Court as follows:

## I.

## PARTIES

1.    GPI is a North Carolina corporation having its principal place of business in

North Carolina.  GPI is a distributor of auto parts to the after market.

2.    Defendant IAP is a Delaware corporation with its principal place of business in

Texas.  IAP is a ".com" company that facilitates the sale of new or rebuilt automotive parts to

automotive service or repair shops.  GPI is a minority shareholder of IAP and has for a number

of years purchased IAP's services to facilitate electronic sales of parts to customers.

## II.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the

Plaintiff and the Defendant are citizens of different states and the amount in controversy exceeds

$75,000.00 exclusive of interest and costs.  Venue is proper under 28 U.S.C. § 1391 because IAP

is a resident of Texas and does business in this District. Moreover, a substantial part of the events giving rise to this claim occurred in this District.

## III.

### FACTUAL BACKGROUND

4.      In late 1999 or early 2000, Hicks Muse Tate and Furst ("HMTF") and others approached GPI with a business venture. HMTF, which was located in Dallas, Texas, proposed to form a ".com" business that would cater to the automotive service and repair market. This new business, IAP, would provide an "e-store" whereby automotive service providers and repair shops could make electronic purchases of new or rebuilt automotive parts from manufacturers or distributors such as GPI. The distributors would be charged a fee based on a percentage of sales made through the e-store.

5.      GPI and other similarly situated businesses were invited to participate in the venture as shareholders. The plan was to conduct an initial public offering ("IPO") shortly after IAP was formed. HTMF would arrange the IPO, which required a showing of financial strength and staying power.

6.      Thereafter, IAP was formed, and IAP, GPI and others entered into a written Stockholders Agreement dated May 31, 2000. A true and correct copy is attached hereto as Exhibit "A."

7.      No IPO ever took place, and none ever will.

8.      After the IPO failed to materialize, IAP declared its belief that paragraph 6.1 of the Stockholders Agreement, captioned "Covenant Not to Compete," created an exclusive dealing contract for the life of the Stockholders Agreement, roughly eleven years. IAP further

indicated that this alleged exclusive dealing arrangement would continue even if GPI sold or surrendered its shares in IAP.

9.      Paragraph 6.1 of the Stockholders Agreement is a non-compete agreement.  It is not a requirements contract nor does it appoint IAP as the sole outlet for all of GPI's e-commerce needs.

10.     Furthermore, Paragraph 6.1 is entirely inconsistent with, and rendered void by, Paragraph 2.2 of the Shareholders Agreement, which expressly provides that GPI may engage in any current or future business activity, whether or not such activities compete with IAP.

11.     The very nature of the .com industry is one of change and evolution.  An eleven year non-compete agreement with no geographic limitations is on its face unreasonable.

12.     GPI no longer uses IAP to facilitate most of its internet sales.  Nonetheless, IAP continues to invoice GPI for services GPI no longer uses based on internet sales conducted through GPI's own, internal internet capabilities.

13.     GPI has made these payments while at the same time trying to reach some amicable separation from IAP, but these negotiations have thus far been without effect.

14.     Already GPI has paid over $1 million for services it never received.

**IV.**

**CAUSES OF ACTION**

*Count One*

15.     The foregoing allegations are incorporated herein by reference.

16.     GPI seeks a declaration of the parties' rights under the agreement including, but not limited to, the following:

>       a.      That paragraph 6.1 of the Stockholders Agreement creates a
>               covenant not to compete and does not by its terms create an

          exclusive dealing arrangement or otherwise make IAP a sole outlet;

b.     That paragraph 6.1 is rendered void or unenforceable by paragraph 2.2 of the same contract; and

c.     That paragraph 6.1 is unreasonable on its face and is void as an unreasonable restraint of trade under both federal and state law.

### *Count Two*

17.    The foregoing allegations are incorporated herein by reference.

18.    GPI seeks a declaration of the parties' rights under the agreement including:

a.     That GPI ceases to be bound by the Stockholders Agreement when and if GPI ceases to own shares of IAP; and therefore

b.     That paragraph 6.1 has no application if GPI ceases to be a shareholder in IAP.

### *Count Three*

19.    The foregoing allegations are incorporated herein by reference.

20.    GPI seeks recovery of all sums paid to IAP for which no services were rendered under the common law theories of quantum meruit and unjust enrichment.  An implied contract exists to return sums for which no services were rendered.

### *Count Four*

21.    The foregoing allegations are incorporated herein by reference.

22.    Demand has been made for the damages claimed herein.

23.    GPI prays to recover all its reasonable attorneys' fees as allowed by law.

## V.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that a summons issue and that upon final hearing hereof, Plaintiffs be awarded a judgment against IAP for declaratory relief, damages, attorneys' fees, pre and post-judgment interest, and for such other relief to which Plaintiff may show itself entitled, both at law and in equity.

Respectfully submitted,

Werner A. Powers
State Bar No. 16218800
Leslie C. Thorne
State Bar No. 24046974

HAYNES AND BOONE, L.L.P.
901 Main Street, Suite 3100
Dallas, Texas 75202
Telephone: (214) 651-5000
Telecopier: (214) 651-5940

ATTORNEYS FOR PLAINTIFFS

D-1556348_1.DOC

**ORIGINAL COMPLAINT**                                                                 **Page 5**

# STOCKHOLDERS AGREEMENT

# INTERNET AUTOPARTS, INC.

---

Dated as of May 31, 2000

---



# TABLE OF CONTENTS

| | | |
|---|---|---|
| Article 1 | DEFINITIONS | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Rules of Construction | 5 |
| Article 2 | MANAGEMENT OF THE COMPANY AND CERTAIN ACTIVITIES | 5 |
| 2.1 | Board of Directors | 5 |
| 2.2 | Other Activities of the Holders; Fiduciary Duties. | 7 |
| Article 3 | REGISTRATION RIGHTS | 7 |
| 3.1 | Demand Registration | 7 |
| 3.2 | Piggyback Registrations | 9 |
| 3.3 | Holdback Agreement | 10 |
| 3.4 | Registration Procedures | 11 |
| 3.5 | Suspension of Dispositions | 15 |
| 3.6 | Registration Expenses | 15 |
| 3.7 | Indemnification | 16 |
| Article 4 | TRANSFERS OF SECURITIES | 19 |
| 4.1 | Preemptive Rights | 19 |
| 4.2 | Restrictions on Transfer. | 20 |
| 4.3 | Prohibited Transfers. | 20 |
| 4.4 | Right of First Offer. | 20 |
| 4.5 | Put Right | 23 |
| 4.6 | Transfer and Exchange | 23 |
| 4.7 | Replacement Securities | 23 |
| Article 5 | LIMITATION ON TRANSFERS | 23 |
| 5.1 | Restrictions on Transfer | 23 |
| 5.2 | Restrictive Legends | 24 |
| 5.3 | Notice of Proposed Transfers | 24 |
| 5.4 | Termination of Certain Restrictions | 25 |
| Article 6 | PROVISION OF SERVICES; NON-COMPETE | 25 |
| 6.1 | Covenant Not to Compete | 25 |
| 6.2 | Provision of Services; Commissions | 26 |
| 6.3 | Quality Assurance | 26 |
| Article 7 | TERMINATION | 28 |

TABLE OF CONTENTS
(CONTINUED)

| | | |
|---|---|---|
| 7.1 | Termination | 28 |
| Article 8 | MISCELLANEOUS | 28 |
| 8.1 | Notices | 28 |
| 8.2 | Legal Holidays | 29 |
| 8.3 | Governing Law | 29 |
| 8.4 | Successors and Assigns | 29 |
| 8.5 | Duplicate Originals | 29 |
| 8.6 | Severability | 29 |
| 8.7 | No Waivers; Amendments | 29 |

## STOCKHOLDERS AGREEMENT

THIS STOCKHOLDERS AGREEMENT (this "Stockholders Agreement") dated as of May 31, 2000, is entered into by and among Internet Autoparts, Inc., a Delaware corporation (including its successors, the "Company"), and the securityholders listed on the signature pages hereof.

In consideration of the premises, mutual covenants and agreements hereinafter contained and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Definitions.

"**Accredited Investor**" means an "Accredited Investor," as defined in Regulation D, or any successor rule then in effect.

"**Accredited Offeree**" shall have the meaning provided in Section 4.1.1 hereof.

"**Advice**" shall have the meaning provided in Section 3.5 hereof.

"**Affiliate**" means, with respect to any Person, any Person who, directly or indirectly, controls, is controlled by or is under common control with that Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"**Business Day**" means a day that is not a Legal Holiday.

"**Common Stock**" means shares of the Common Stock, $0.01 par value per share, of the Company, and any capital stock into which such Common Stock thereafter may be changed.

"**Common Stock Equivalents**" means, without duplication with any other Common Stock or Common Stock Equivalents, any rights, warrants, options, convertible securities or indebtedness, exchangeable securities or indebtedness, or other rights, exercisable for or convertible or exchangeable into, directly or indirectly, Common Stock of the Company and securities convertible or exchangeable into Common Stock of the Company, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

"**Company**" shall have the meaning set forth in the introductory paragraph hereof.

"**Demand Registration**" shall have the meaning set forth in Section 3.1.1 hereof.

"**Demand Request**" shall have the meaning set forth in Section 3.1.1 hereof.

"**Distributor Holders**" means GPI and the Other Holders.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the SEC thereunder.

"**Excluded Registration**" means a registration under the Securities Act of (i) securities pursuant to one or more Demand Registrations pursuant to Section 3 hereof, (ii) securities registered on Form S-8 or any similar successor form and (iii) securities registered to effect the acquisition of or combination with another Person.

"**Fully-Diluted Common Stock**" means, at any time, the then outstanding Common Stock of the Company plus (without duplication) all shares of Common Stock issuable, whether at such time or upon the passage of time or the occurrence of future events, upon the exercise, conversion, or exchange of all then outstanding Common Stock Equivalents.

"**HMTF**" means HM Coop LLC, a Delaware limited liability company.

"**Holder**" means (i) a securityholder listed on the signature page hereof and (ii) a person who becomes a securityholder after the date hereof pursuant to a joinder or other agreement entered into between such person and the Company, and (iii) any direct or indirect transferee of any such securityholder who shall become a party to this Stockholders Agreement.

"**HSR Act**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Legal Holiday**" shall have the meaning provided in Section 8.2 hereof.

"**Material Adverse Effect**" shall have the meaning provided in Section 3.1.3 hereof.

"**NASD**" shall have the meaning provided in Section 3.6 hereof.

"**National Account**" shall mean a person or group of persons with at least 20 service dealer store locations or a fleet of at least 100 vehicles.

"**Offer Notice**" shall have the meaning provided in Section 4.1.1 hereof.

"**Offered Securities**" shall have the meaning provided in Section 4.1.1 hereof.

"**Other Holders**" mean the Holders other than CCI, HMTF, GPI, G. Staats and P. Staats.

"**Party Designee**" shall have the meaning provided in Section 2.1.1 hereof.

"**Parts Distributors**" shall have the meaning provided in Section 4.1.2 hereof.

"**Participation Offer**" shall have the meaning provided in Section 4.4.2 hereof.

"**Person**" or "**person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or other agency or political subdivision thereof.

"**Preemptive Rights Offer**" shall have the meaning set forth in Section 4.1.1 hereof.

"**Program Group**" means a group of Parts Distributors operating stores under a common brand. Current examples in the marketplace include CARQUEST and NAPA.

"**Qualified IPO**" means a firm commitment underwritten public offering of Common Stock pursuant to a registration statement under the Securities Act where both (i) the proceeds (prior to deducting any underwriters' discounts and commissions) equal or exceed Twenty-Five Million Dollars ($25,000,000) and (ii) upon consummation of such offering, the Common Stock is listed on the New York Stock Exchange or authorized to be quoted and/or listed on the Nasdaq National Market.

"**Registrable Shares**" means at any time the Common Stock of the Company owned by the Holders, whether owned on the date hereof or acquired hereafter; provided, however, that Registrable Shares shall not include any shares (i) the sale of which has been registered pursuant to the Securities Act and which shares have been sold pursuant to such registration or (ii) which have been sold pursuant to Rule 144 of the SEC under the Securities Act.

**"Registration Expenses"** shall have the meaning provided in Section 3.6 hereof.

**"Regulation D"** means Regulation D promulgated under the Securities Act by the SEC.

**"Required Filing Date"** shall have the meaning provided in Section 3.1.1(b) hereof.

**"Required Holders"** means Holders who then own beneficially more than 50% of the aggregate number of shares of Common Stock subject to this Stockholders Agreement.

**"Requisite Directors"** means (a) in the event that the Board of Directors consists of nine (9) persons, seven (7) directors, (b) in the event that the Board of Directors consists of more than nine (9) persons, the number of directors equal to the total number of directors less two (2), and (c) in the event that the Board of Director consists of less than nine (9) persons, the number of directors equal to 80% of the total number of directors, rounded up to the nearest whole number.

**"SEC"** means the Securities and Exchange Commission.

**"Securities"** means the Common Stock.

**"Securities Act"** means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the SEC thereunder.

**"Seller Affiliates"** shall have the meaning provided in Section 3.7.1 hereof.

**"Stockholders Agreement"** means this Stockholders Agreement, as such from time to time may be amended.

**"Subsidiary"** of any Person means (i) a corporation a majority of whose outstanding shares of capital stock or other equity interests with voting power, under ordinary circumstances, to elect directors, is at the time, directly or indirectly, owned by such Person, by one or more subsidiaries of such Person or by such Person and one or more subsidiaries of such Person, and (ii) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (x) at least a majority ownership interest or (y) the power to elect or direct the election of the directors or other governing body of such Person.

**"Suspension Notice"** shall have the meaning provided in Section 3.5 hereof.

**"Transfer"** means any disposition of any Security or any interest therein that would constitute a "sale" thereof within the meaning of the Securities Act.

**"Transfer Notice"** shall have the meaning provided in <u>Section 5.3</u> hereof.

1.2     <u>Rules of Construction</u>.  Unless the context otherwise requires

(1)     a term has the meaning assigned to it;

(2)     "or" is not exclusive;

(3)     words in the singular include the plural, and words in the plural include the singular;

(4)     provisions apply to successive events and transactions; and

(5)     "herein," "hereof" and other words of similar import refer to this Stockholders Agreement as a whole and not to any particular Article, Section or other subdivision.

ARTICLE 2

**MANAGEMENT OF THE COMPANY AND CERTAIN ACTIVITIES**

2.1     <u>Board of Directors</u>.

2.1.1     <u>Board Representation</u>.  The Board of Directors of the Company shall consist of a maximum of nine (9) directors, one each being appointed by Cooperative Computing, Inc. ("<u>CCI</u>"), HMTF, General Parts, Inc. ("<u>GPI</u>"), O'Reilly Automotive, Inc. ("<u>O'Reilly</u>"), and Glenn E. Staats ("<u>G. Staats</u>"), acting on behalf of himself and Preston W. Staats ("<u>P. Staats</u>") (each, a "<u>Nominating Holder</u>," and each such director so appointed, a "<u>Party Designee</u>"), and at least two (2) and at most three (3) directors (the "<u>Independent Directors</u>") being appointed by mutual agreement of the Party Designees; <u>provided</u> <u>that</u> the number of Independent Directors shall be that number which causes the total number of directors to be odd.  In addition, unless otherwise agreed to in writing by the Nominating Holders, in the event the Company issues to Parts Distributors in a given Program Group (taken as a whole), other than the CARQUEST and the Alliance Program Groups, in excess of one million (1,000,000) shares of Common Stock and/or Common Stock Equivalents convertible or exercisable for in excess of one million (1,000,000) shares of Common Stock, the Parts Distributor in such Program Group that purchases the largest number of shares of Common Stock (upon which, such Parts Distributor shall be deemed to be a Nominating Holder) shall be entitled to appoint one (1) director to the Board of Directors of the Company (who will be deemed to be a Party Designee), and the Board of Directors of the Company shall be enlarged by one (1) director for each such director so appointed; <u>provided</u> <u>that</u> in no event shall the Board of Directors have more than nine (9) directors, at least two of whom are Independent Directors; <u>provided</u>, <u>further</u> that to cause the total number of directors to

remain an odd number, if there are, at any given time, three (3) Independent Directors on the Board of Directors of the Company, the then current Party Designees shall designate one (1) of the Independent Directors as a removable director ("Removable Director"), and that such Removable Director shall be removed by the Board of Directors of the Company upon the occurrence of the first Parts Distributor to become a Nominating Holder and its appointment of a director to the Board of Directors of the Company; provided, however, that upon the occurrence of a second Parts Distributor becoming a Nominating Holder and its appointment of a director to the Board of Directors of the Company, such Removable Director (or another Independent Director that is selected by the mutual agreement of the Party Designees) shall be appointed to the Board of Directors of the Company in order to cause the total number of directors to remain an odd number. Each Holder shall vote his or its shares of Common Stock at any regular or special meeting of stockholders of the Company or in any written consent executed in lieu of such a meeting of stockholders and shall take all other actions necessary to give effect to the agreements contained in this Stockholders Agreement (including without limitation the election of persons designated by the Nominating Holders to be elected as directors as described in the preceding sentence) and to ensure that the certificate of incorporation and bylaws as in effect immediately following the date hereof do not, at any time thereafter, conflict in any respect with the provisions of this Stockholders Agreement. In order to effectuate the provisions of this Section 2.1, each Holder hereby agrees that when any action or vote is required to be taken by such Holder pursuant to this Stockholders Agreement, such Holder shall use his or its best efforts to call, or cause the appropriate officers and directors of the Company to call, a special or annual meeting of stockholders of the Company, as the case may be, or execute or cause to be executed a consent in writing in lieu of any such meetings pursuant to Section 228(a) of the General Corporation Law of the State of Delaware.

2.1.2 Vacancies. If, prior to his or her election to the Board of Directors of the Company pursuant to Section 2.1.1 hereof, any Party Designee shall be unable or unwilling to serve as a director of the Company, the respective Nominating Holder appointing such Party Designee shall be entitled to nominate a replacement who shall then be a Party Designee for purposes of this Section 2. If, following an election to the Board of Directors of the Company pursuant to Section 2.1.1 hereof, any Party Designee shall resign, be removed (which shall occur only with the consent of the Nominating Holder appointing such Party Designee), or be unable to serve for any reason prior to the expiration of his term as a director of the Company, the respective Nominating Holder appointing such Party Designee shall, within thirty (30) days of such event, notify the Board of Directors of the Company in writing of a replacement Party Designee, and either (i) the Holders shall vote their shares of Common Stock, at any regular or special meeting called for the purpose of filling positions on the Board of Directors of the Company or in any written consent executed in lieu of such a meeting of stockholders, and shall take all such other actions necessary to ensure the election to the Board of Directors of the Company of such replacement Party Designee to fill the unexpired term of the Party Designee who such new Party Designee is replacing or (ii) the Board of Directors shall elect such replacement Party Designee to fill the unexpired term of the Party Designee who such new Party Designee is replacing. If a Nominating Holder requests that their Party Designee be removed as a Director (with or without cause) by

written notice thereof to the Company, then the Company shall take all actions necessary to effect, and each of the Holders shall vote all its or his capital stock in favor of, such removal upon such request.

     2.1.3   <u>Termination of Rights</u>.  The right of each party hereto to appoint directors under <u>Section 2.1.1</u>, but not the obligation of the Holders to vote their shares as provided herein, shall terminate upon the first to occur of (i) the termination or expiration of this Stockholders Agreement or this <u>Article 2</u>, (ii) such time as the parties hereto elect in writing to terminate their rights under this <u>Article 2</u>, or (iii) such time as the Nominating Holders (and their respective Affiliates and permitted transferees, it being understood that CCI shall not be deemed an Affiliate of HMTF, P. Staats or G. Staats for purposes of this <u>Section 2.1.3</u>) cease to own at least fifty percent (50%) of the shares of Common Stock held by such Holders as of the date of their initial investment (as set forth on <u>Schedule 2.1.3</u> hereto).

     2.1.4   <u>Costs and Expenses</u>.  The Company will pay all reasonable out-of-pocket expenses incurred by the Party Designees in connection with their participation in meetings of the Board of Directors (and committees thereof) of the Company and the Boards of Directors (and committees thereof) of the Subsidiaries of the Company.

     2.1.5   <u>Super-Majority Approval</u>.  The approval of two-thirds (2/3rds) of the Board of Directors of the Company will be required to approve the following actions: a merger, acquisition, consolidation, liquidation, sale of all or substantially all of the assets of the Company, the appointment of a Chief Executive Officer, Chief Financial Officer or Chief Technology Officer, the issuance of equity securities to new stockholders who are engaged in the automotive aftermarket business (other than Genuine Parts Company), except for those persons listed on <u>Schedule 2.1.5</u> hereto, and a material change in the Company's line of business.

    2.2   <u>Other Activities of the Holders; Fiduciary Duties</u>.  It is understood and accepted that the Holders and their Affiliates have interests in other business ventures which may be in conflict with the activities of the Company and its Subsidiaries and that, subject to applicable law and any other agreement that may be executed by the Holder, nothing in this Stockholders Agreement shall limit the current or future business activities of the Holders whether or not such activities are competitive with those of the Company and its Subsidiaries.  Nothing in this Stockholders Agreement, express or implied, shall relieve any officer or director of the Company or any of its Subsidiaries, or any Holder, of any fiduciary or other duties or obligations they may have to the Company's stockholders.

**ARTICLE 3**
**REGISTRATION RIGHTS**

    3.1   <u>Demand Registration</u>.

     3.1.1   <u>Request for Registration</u>.

(a)    At any time after one hundred eighty (180) days after the consummation of a Qualified IPO, any Holder or Holders may request the Company, in writing (a "Demand Request"), to effect the registration under the Securities Act of all or part of its or their Registrable Shares (a "Demand Registration"). Notwithstanding the foregoing, no Demand Request will be effective hereunder unless (i) the Registrable Shares proposed to be sold by the Holders requesting the Demand Registration (the "Requesting Holders," which term shall include parties deemed "Requesting Holders" pursuant to Section 3.1.4 hereof) shall have a fair market value (determined in good faith by the Company's Board of Directors), at the time of the Company's receipt of the Demand Request, of Ten Million Dollars ($10,000,000) or more and (ii) the offering to be consummated pursuant to such Demand Request will not, in the reasonable opinion of an investment banking firm selected by the Company, have a material adverse effect on the market price of the Common Stock.

(b)    Each Demand Request shall specify the number of Registrable Shares proposed to be sold.  Subject to Section 3.1.5, the Company shall file the Demand Registration within ninety (90) days after receiving a Demand Request (the "Required Filing Date") and shall use all commercially reasonable efforts to cause the same to be declared effective by the SEC as promptly as practicable after such filing.

3.1.2    Selection of Underwriters.  In the event the offering of Registrable Shares pursuant to a Demand Registration shall be in the form of a "firm commitment" underwritten offering, the Requesting Holders of a majority of the Registrable Shares to be registered in a Demand Registration shall select the investment banking firm or firms to manage the underwritten offering; provided that such selection shall be subject to the consent of the Company, which consent shall not be unreasonably withheld.

3.1.3    Priority on Demand Registrations.  No securities to be sold for the account of any Person (including the Company) other than a Requesting Holder shall be included in a Demand Registration unless the managing underwriter or underwriters, if applicable, shall advise the Company or the Requesting Holders in writing that the inclusion of such securities will not materially and adversely affect the price or success of the offering (a "Material Adverse Effect").  Furthermore, in the event the managing underwriter or underwriters shall advise the Company or the Requesting Holders that even after exclusion of all securities of other Persons pursuant to the immediately preceding sentence, the amount of Registrable Shares proposed to be included in such Demand Registration by Requesting Holders is sufficiently large to cause a Material Adverse Effect, the Registrable Shares of the Requesting Holders to be included in such Demand Registration shall equal the number of shares which the Company is so advised can be sold in such offering without a Material Adverse Effect and such shares shall be allocated pro rata among the Requesting Holders on the basis of the number of Registrable Shares requested to be included in such registration by each such Requesting Holder.

3.1.4    Rights of Nonrequesting Holders.  Upon receipt of any Demand Request, the Company shall promptly (but in any event within ten (10) days) give written notice of such proposed Demand Registration to all other Holders, who shall have the

right, exercisable by written notice to the Company within twenty (20) days of their receipt of the Company's notice, to elect to include in such Demand Registration such portion of their Registrable Securities as they may request. All Holders requesting to have their Registrable Shares included in a Demand Registration in accordance with the preceding sentence shall be deemed to be "Requesting Holders" for purposes of this Section 3.1.

3.1.5   Deferral of Filing. The Company may defer the filing (but not the preparation) of a registration statement required by Section 3.1 until a date not later than one hundred eighty (180) days after the Required Filing Date (or, if longer, one hundred eighty (180) days after the effective date of the registration statement contemplated by clause (ii) below) if (i) at the time the Company receives the Demand Request, the Company or any of its Subsidiaries are engaged in confidential negotiations or other confidential business activities, disclosure of which would be required in such registration statement (but would not be required if such registration statement were not filed), and the Board of Directors of the Company determines in good faith that such disclosure would be materially detrimental to the Company and its stockholders, or (ii) prior to receiving the Demand Request, the Board of Directors had determined to effect a registered underwritten public offering of the Company's securities for the Company's account and the Company had taken substantial steps (including, but not limited to, selecting a managing underwriter for such offering) and is proceeding with reasonable diligence to effect such offering. A deferral of the filing of a registration statement pursuant to this Section 3.1.5 shall be lifted, and the requested registration statement shall be filed forthwith, if, in the case of a deferral pursuant to clause (i) of the preceding sentence, the negotiations or other activities are disclosed or terminated, or, in the case of a deferral pursuant to clause (ii) of the preceding sentence, the proposed registration for the Company's account is abandoned. In order to defer the filing of a registration statement pursuant to this Section 3.1.5, the Company shall promptly (but in any event within ten (10) days), upon determining to seek such deferral, deliver to each Requesting Holder a certificate signed by an executive officer of the Company stating that the Company is deferring such filing pursuant to this Section 3.1.5 and a general statement of the reason for such deferral and an approximation of the anticipated delay. Within twenty (20) days after receiving such certificate, the holders of a majority of the Registrable Shares held by the Requesting Holders and for which registration was previously requested may withdraw such Demand Request by giving notice to the Company; if withdrawn, the Demand Request shall be deemed not to have been made for all purposes of this Stockholders Agreement. The Company may defer the filing of a particular registration statement pursuant to this Section 3.1.5 only once.

3.2    Piggyback Registrations.

3.2.1   Right to Piggyback. Each time the Company proposes to register any of its equity securities (other than pursuant to an Excluded Registration) under the Securities Act for sale to the public (whether for the account of the Company or the account of any securityholder of the Company) and the form of registration statement to be used permits the registration of Registrable Shares, the Company shall give prompt written notice to each Holder of Registrable Shares (which notice shall be given not less

than thirty (30) days prior to the effective date of the Company's registration statement), which notice shall offer each such Holder the opportunity to include any or all of its or his Registrable Shares in such registration statement, subject to the limitations contained in Section 3.2.2 hereof. Each Holder who desires to have its or his Registrable Shares included in such registration statement shall so advise the Company in writing (stating the number of shares desired to be registered) within twenty (20) days after the date of such notice from the Company. Any Holder shall have the right to withdraw such Holder's request for inclusion of such Holder's Registrable Shares in any registration statement pursuant to this Section 3.2.1 by giving written notice to the Company of such withdrawal. Subject to Section 3.2.2 below, the Company shall include in such registration statement all such Registrable Shares so requested to be included therein; provided, however, that the Company may at any time withdraw or cease proceeding with any such registration if it shall at the same time withdraw or cease proceeding with the registration of all other equity securities originally proposed to be registered.

3.2.2  Priority on Registrations.  If the managing underwriter advises the Company that the inclusion of the Registrable Shares requested to be included in the registration statement would cause a Material Adverse Effect, the Company will be obligated to include in such registration statement, as to each Requesting Holder, only a portion of the shares such Holder has requested be registered equal to the ratio which such Holder's requested shares bears to the total number of shares requested to be included in such registration statement by all Persons (including Requesting Holders) who have requested (pursuant to contractual registration rights) that their shares be included in such registration statement. If as a result of the provisions of this Section 3.2.2 any Holder shall not be entitled to include all Registrable Securities in a registration that such Holder has requested to be so included, such Holder may withdraw such Holder's request to include Registrable Shares in such registration statement. No Person may participate in any registration statement hereunder unless such Person (x) agrees to sell such person's Registrable Shares on the basis provided in any underwriting arrangements approved by the Company and (y) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements, and other documents, each in customary form, reasonably required under the terms of such underwriting arrangements; provided, however, that no such Person shall be required to make any representations or warranties in connection with any such registration other than representations and warranties as to (i) such Person's ownership of his or its Registrable Shares to be sold or transferred free and clear of all liens, claims, and encumbrances, (ii) such Person's power and authority to effect such transfer, and (iii) such matters pertaining to compliance with securities laws as may be reasonably requested; provided further, however, that the obligation of such Person to indemnify pursuant to any such underwriting arrangements shall be several, not joint and several, among such Persons selling Registrable Shares, and the liability of each such Person will be in proportion to, and provided further that such liability will be limited to, the net amount received by such Person from the sale of his or its Registrable Shares pursuant to such registration.

3.3  Holdback Agreement.  Unless the managing underwriter otherwise agrees, each of the Company and the Holders agrees (and the Company agrees, in connection

with any underwritten registration, to use its reasonable efforts to cause its Affiliates to agree) not to effect any public sale or private offer or distribution of any Common Stock or Common Stock Equivalents during the ten business days prior to the effectiveness under the Securities Act of any underwritten registration and during such time period after the effectiveness under the Securities Act of any underwritten registration (not to exceed one hundred eighty (180) days) (except, if applicable, as part of such underwritten registration) as the Company and the managing underwriter may agree.

3.4    Registration Procedures.  Whenever any Holder has requested that any Registrable Shares be registered pursuant to this Stockholders Agreement, the Company will use its commercially reasonable efforts to effect the registration and the sale of such Registrable Shares in accordance with the intended method of disposition thereof, and pursuant thereto the Company will as reasonably expeditiously as possible:

(i)  prepare and file with the SEC a registration statement on any appropriate form under the Securities Act with respect to such Registrable Shares and use its commercially reasonable efforts to cause such registration statement to become effective;

(ii)  prepare and file with the SEC such amendments, post-effective amendments, and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of not less than one hundred eighty (180) days (or such lesser period as is necessary for the underwriters in an underwritten offering to sell unsold allotments) and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such registration statement;

(iii)  furnish to each seller of Registrable Shares and the underwriters of the securities being registered such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), any documents incorporated by reference therein and such other documents as such seller or underwriters may reasonably request in order to facilitate the disposition of the Registrable Shares owned by such seller or the sale of such securities by such underwriters (it being understood that, subject to Section 3.5 and the requirements of the Securities Act and applicable state securities laws, the Company consents to the use of the prospectus and any amendment or supplement thereto by each seller and the underwriters in connection with the offering and sale of the Registrable Shares covered by the registration statement of which such prospectus, amendment or supplement is a part);

(iv)  use its commercially reasonable efforts to register or qualify such Registrable Shares under such other securities or blue sky laws of

such jurisdictions as the managing underwriter reasonably requests (or, in the event the registration statement does not relate to an underwritten offering, as the holders of a majority of such Registrable Shares may reasonably request); use its commercially reasonable efforts to keep each such registration or qualification (or exemption therefrom) effective during the period in which such registration statement is required to be kept effective; and do any and all other acts and things which may be reasonably necessary or advisable to enable each seller to consummate the disposition of the Registrable Shares owned by such seller in such jurisdictions (provided, however, that the Company will not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph or (B) consent to general service of process in any such jurisdiction);

(v)  promptly notify each seller and each underwriter and (if requested by any such Person) confirm such notice in writing (A) when a prospectus or any prospectus supplement or post-effective amendment has been filed and, with respect to a registration statement or any post-effective amendment, when the same has become effective, (B) of the issuance by any state securities or other regulatory authority of any order suspending the qualification or exemption from qualification of any of the Registrable Shares under state securities or "blue sky" laws or the initiation of any proceedings for that purpose, and (C) of the happening of any event which makes any statement made in a registration statement or related prospectus untrue or which requires the making of any changes in such registration statement, prospectus or documents so that they will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and, as promptly as practicable thereafter, prepare and file with the SEC and furnish a supplement or amendment to such prospectus so that, as thereafter deliverable to the purchasers of such Registrable Shares, such prospectus will not contain any untrue statement of a material fact or omit a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vi) make generally available to the Company's securityholders an earnings statement satisfying the provisions of Section 11(a) of the Securities Act no later than thirty (30) days after the end of the twelve (12) month period beginning with the first day of the Company's first fiscal quarter commencing after the effective date of a registration statement, which earnings statement shall cover said twelve (12) month period, and which requirement will be deemed to be satisfied if the Company timely files complete and accurate information on Forms 10-Q, 10-K and 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(vii)   if requested by the managing underwriter or any seller promptly incorporate in a prospectus supplement or post-effective amendment such information as the managing underwriter or any seller reasonably requests to be included therein, including, without limitation, with respect to the Registrable Shares being sold by such seller, the purchase price being paid therefor by the underwriters and with respect to any other terms of the underwritten offering of the Registrable Shares to be sold in such offering, and promptly make all required filings of such prospectus supplement or post-effective amendment;

(viii)   as promptly as practicable after filing with the SEC of any document which is incorporated by reference into a registration statement (in the form in which it was incorporated), deliver a copy of each such document to each seller;

(ix)   cooperate with the sellers and the managing underwriter to facilitate the timely preparation and delivery of certificates (which shall not bear any restrictive legends unless required under applicable law) representing securities sold under any registration statement, and enable such securities to be in such denominations and registered in such names as the managing underwriter or such sellers may request and keep available and make available to the Company's transfer agent prior to the effectiveness of such registration statement a supply of such certificates;

(x)   promptly make available for inspection by any seller, any underwriter participating in any disposition pursuant to any registration statement, and any attorney, accountant or other agent or representative retained by any such seller or underwriter (collectively, the "Inspectors"), all financial and other records, pertinent corporate documents and properties of the Company (collectively, the "Records"), as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information requested by any such Inspector in connection with such registration statement; provided, that, unless the disclosure of such Records is necessary to avoid or correct a misstatement or omission in the registration statement or the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, the Company shall not be required to provide any information under this subparagraph (x) if (A) the Company believes, after consultation with counsel for the Company, that to do so would cause the Company to forfeit an attorney-client privilege that was applicable to such information or (B) if either (1) the Company has requested and been granted from the SEC confidential treatment of such information contained in any filing with the SEC or documents provided supplementally or otherwise or (2) the Company reasonably determines in good faith that such Records are confidential and so notifies the Inspectors in writing unless prior to furnishing any such information with respect to

(A) or (B) such Holder of Registrable Securities requesting such information agrees to enter into a confidentiality agreement in customary form and subject to customary exceptions; and provided, further that each Holder of Registrable Securities agrees that it will, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, give notice to the Company and allow the Company, at its expense, to undertake appropriate action and to prevent disclosure of the Records deemed confidential;

(xi) furnish to each seller and underwriter a signed counterpart of (A) an opinion or opinions of counsel to the Company, and (B) a comfort letter or comfort letters from the Company's independent public accountants, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as the sellers or managing underwriter reasonably requests;

(xii) cause the Registrable Shares included in any registration statement to be (A) listed on each securities exchange, if any, on which similar securities issued by the Company are then listed, or (B) authorized to be quoted and/or listed (to the extent applicable) on the National Association of Securities Dealers, Inc. Automated Quotation System or the Nasdaq National Market if the Registrable Shares so qualify;

(xiii) provide a CUSIP number for the Registrable Shares included in any registration statement not later than the effective date of such registration statement;

(xiv) cooperate with each seller and each underwriter participating in the disposition of such Registrable Shares and their respective counsel in connection with any filings required to be made with the National Association of Securities Dealers, Inc.;

(xv) during the period when the prospectus is required to be delivered under the Securities Act, promptly file all documents required to be filed with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act;

(xvi) notify each seller of Registrable Shares promptly of any request by the SEC for the amending or supplementing of such registration statement or prospectus or for additional information;

(xvii) prepare and file with the SEC promptly any amendments or supplements to such registration statement or prospectus which, in the opinion of counsel for the Company or the managing underwriter, is required in connection with the distribution of the Registrable Shares;

(xviii)    enter into such agreements (including underwriting agreements in the managing underwriter's customary form) as are customary in connection with an underwritten registration; and

(xix)  advise each seller of such Registrable Shares, promptly after it shall receive notice or obtain knowledge thereof, of the issuance of any stop order by the SEC suspending the effectiveness of such registration statement or the initiation or threatening of any proceeding for such purpose and promptly use its best efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued.

3.5    <u>Suspension of Dispositions</u>.  Each Holder agrees by acquisition of any Registrable Shares that, upon receipt of any notice (a "<u>Suspension Notice</u>") from the Company of the happening of any event of the kind described in <u>Section 3.4(v)(C)</u> such Holder will forthwith discontinue disposition of Registrable Shares until such Holder's receipt of the copies of the supplemented or amended prospectus, or until it is advised in writing (the "<u>Advice</u>") by the Company that the use of the prospectus may be resumed, and has received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Company, such Holder will deliver to the Company all copies, other than permanent file copies then in such Holder's possession, of the prospectus covering such Registrable Shares current at the time of receipt of such notice.  In the event the Company shall give any such notice, the time period regarding the effectiveness of registration statements set forth in <u>Section 3.4(ii)</u> hereof shall be extended by the number of days during the period from and including the date of the giving of the Suspension Notice to and including the date when each seller of Registrable Shares covered by such registration statement shall have received the copies of the supplemented or amended prospectus or the Advice.  The Company shall use its commercially reasonable efforts and take such actions as are reasonably necessary to render the Advice as promptly as practicable.

3.6    <u>Registration Expenses</u>.    All expenses incident to the Company's performance of or compliance with this <u>Article 3</u> including, without limitation, all registration and filing fees, all fees and expenses associated with filings required to be made with the National Association of Securities Dealers, Inc. ("<u>NASD</u>") (including, if applicable, the fees and expenses of any "qualified independent underwriter" as such term is defined in Schedule E of the By-Laws of the NASD, and of its counsel), as may be required by the rules and regulations of the NASD, fees and expenses of compliance with securities or "blue sky" laws (including reasonable fees and disbursements of counsel in connection with "blue sky" qualifications of the Registrable Shares), rating agency fees, printing expenses (including expenses of printing certificates for the Registrable Shares in a form eligible for deposit with Depository Trust Company and of printing prospectuses if the printing of prospectuses is requested by a holder of Registrable Shares), messenger and delivery expenses, the Company's internal expenses (including without limitation all salaries and expenses of its officers and employees performing legal or accounting duties), the fees and expenses incurred in connection with any listing of the Registrable Shares, fees and expenses of counsel for the Company and

its independent certified public accountants (including the expenses of any special audit or "cold comfort" letters required by or incident to such performance), securities acts liability insurance (if the Company elects to obtain such insurance), the fees and expenses of any special experts retained by the Company in connection with such registration, and the fees and expenses of other persons retained by the Company and reasonable fees and expenses of one firm of counsel for the sellers (which shall be selected by the holders of a majority of the Registrable Shares being included in any particular registration statement) (all such expenses being herein called "Registration Expenses") will be borne by the Company whether or not any registration statement becomes effective; provided, that in no event shall Registration Expenses include any underwriting discounts, commissions, or fees attributable to the sale of the Registrable Shares or any counsel (except as provided above), accountants, or other persons retained or employed by the Holders.

    3.7    <u>Indemnification</u>.

        3.7.1   The Company agrees to indemnify and reimburse, to the fullest extent permitted by law, each seller of Registrable Shares, and each of its employees, advisors, agents, representatives, partners, officers, and directors and each Person who controls such seller (within the meaning of the Securities Act or the Exchange Act) and any agent or investment advisor thereof (collectively, the "Seller Affiliates") (A) against any and all losses, claims, damages, liabilities, and expenses, joint or several (including, without limitation, attorneys' fees and disbursements except as limited by Section 3.7.3) based upon, arising out of, related to or resulting from any untrue or alleged untrue statement of a material fact contained in any registration statement, prospectus, or preliminary prospectus or any amendment thereof or supplement thereto, or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, (B) against any and all loss, liability, claim, damage, and expense whatsoever, as incurred, to the extent of the aggregate amount paid in settlement of any litigation or investigation or proceeding by any governmental agency or body, commenced or threatened, or of any claim whatsoever based upon, arising out of, related to or resulting from any such untrue statement or omission or alleged untrue statement or omission, and (C) against any and all costs and expenses (including reasonable fees and disbursements of counsel) as may be reasonably incurred in investigating, preparing, or defending against any litigation, or investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever based upon, arising out of, related to or resulting from any such untrue statement or omission or alleged untrue statement or omission, to the extent that any such expense or cost is not paid under subparagraph (A) or (B) above; except insofar as the same are made in reliance upon and in strict conformity with information furnished in writing to the Company by such seller or any Seller Affiliate for use therein or arise from such seller's or any Seller Affiliate's failure to deliver a copy of the registration statement or prospectus or any amendments or supplements thereto after the Company has furnished such seller or Seller Affiliate with a sufficient number of copies of the same. The reimbursements required by this Section 3.7.1 will be made by periodic payments during the course of the investigation or defense, as and when bills are received or expenses incurred.

3.7.2   In connection with any registration statement in which a seller of Registrable Shares is participating, each such seller will furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such registration statement or prospectus and, to the fullest extent permitted by law, each such seller will indemnify the Company and its directors and officers and each Person who controls the Company (within the meaning of the Securities Act or the Exchange Act) against any and all losses, claims, damages, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and disbursements except as limited by Section 3.7.3) resulting from any untrue statement or alleged untrue statement of a material fact contained in the registration statement, prospectus, or any preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or alleged untrue statement or omission or alleged omission is contained in any information or affidavit so furnished in writing by such seller or any of its Seller Affiliates specifically for inclusion in the registration statement; provided, that the obligation to indemnify will be several, not joint and several, among such sellers of Registrable Shares, and the liability of each such seller of Registrable Shares will be in proportion to, and provided further that such liability will be limited to, the net amount received by such seller from the sale of Registrable Shares pursuant to such registration statement; provided, however, that such seller of Registrable Shares shall not be liable in any such case to the extent that prior to the filing of any such registration statement or prospectus or amendment thereof or supplement thereto, such seller has furnished in writing to the Company information expressly for use in such registration statement or prospectus or any amendment thereof or supplement thereto which corrected or made not misleading information previously furnished to the Company.

3.7.3   Any Person entitled to indemnification hereunder will (A) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give such notice shall not limit the rights of such Person) and (B) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; provided, however, that any person entitled to indemnification hereunder shall have the right to employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such person unless (X) the indemnifying party has agreed to pay such fees or expenses, or (Y) the indemnifying party shall have failed to assume the defense of such claim and employ counsel reasonably satisfactory to such person.  If such defense is not assumed by the indemnifying party as permitted hereunder, the indemnifying party will not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent will not be unreasonably withheld).   If such defense is assumed by the indemnifying party pursuant to the provisions hereof, such indemnifying party shall not settle or otherwise compromise the applicable claim unless (1) such settlement or compromise contains a full and unconditional release of the indemnified party or (2) the indemnified party otherwise consents in writing.   An indemnifying party who is not entitled to, or elects not to,

assume the defense of a claim will not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party, a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim, in which event the indemnifying party shall be obligated to pay the reasonable fees and disbursements of such additional counsel or counsels.

3.7.4   Each party hereto agrees that, if for any reason the indemnification provisions contemplated by <u>Section 3.7.1</u> or <u>Section 3.7.2</u> are unavailable to or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities, or expenses (or actions in respect thereof) referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, liabilities, or expenses (or actions in respect thereof) in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party in connection with the actions which resulted in the losses, claims, damages, liabilities or expenses as well as any other relevant equitable considerations.   The relative fault of such indemnifying party and indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such indemnifying party or indemnified party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.   The parties hereto agree that it would not be just and equitable if contribution pursuant to this <u>Section 3.7.4</u> were determined by pro rata allocation (even if the Holders or any underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this <u>Section 3.7.4</u>. The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or expenses (or actions in respect thereof) referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or, except as provided in <u>Section 3.7.3</u>, defending any such action or claim. Notwithstanding the provisions of this <u>Section 3.7.4</u>, no Holder shall be required to contribute an amount greater than the dollar amount by which the net proceeds received by such Holder with respect to the sale of any Registrable Shares exceeds the amount of damages which such Holder has otherwise been required to pay by reason of any and all untrue or alleged untrue statements of material fact or omissions or alleged omissions of material fact made in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto related to such sale of Registrable Securities.   No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.   The Holders' obligations in this <u>Section 3.7.4</u> to contribute shall be several in proportion to the amount of Registrable Shares registered by them and not joint.

If indemnification is available under this <u>Section 3.7</u>, the indemnifying parties shall indemnify each indemnified party to the full extent provided in <u>Section 3.7.1</u>

and Section 3.7.2 without regard to the relative fault of said indemnifying party or indemnified party or any other equitable consideration provided for in this Section 3.7.4 subject, in the case of the Holders, to the limited dollar amounts set forth in Section 3.7.2.

3.7.5 The indemnification and contribution provided for under this Stockholders Agreement will remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director, or controlling Person of such indemnified party and will survive the transfer of securities.

## ARTICLE 4
## TRANSFERS OF SECURITIES

4.1 **Preemptive Rights.**

4.1.1 **Rights To Participate in Future Sales.** In case the Company proposes to issue or Transfer any Common Stock and/or Common Stock Equivalents (the "Offered Securities"), then the Company shall, no later than thirty (30) calendar days prior to the consummation of such transaction (the "Issuing Transaction"), give notice in writing (the "Offer Notice") to each Holder of such Issuing Transaction. The Offer Notice shall (i) describe the proposed Issuing Transaction, (ii) identify the proposed purchaser, and (iii) contain an offer (the "Preemptive Rights Offer") to sell to each Holder who certifies (to the reasonable satisfaction of the Company) that such Holder is an Accredited Investor (an "Accredited Offeree"), at the same price and for the same consideration to be paid by the proposed purchaser, all or part of such Accredited Offeree's pro rata portion of the Offered Securities (which shall be the percentage ownership of the Fully-Diluted Common Stock held by such Holder, excluding, for the purposes of such calculation, any shares of Common Stock issuable upon exercise of any Common Stock Equivalents granted pursuant to any employee, officer or director benefit plan or arrangement). If any such Holder fails to accept such Preemptive Rights Offer by written notice fifteen (15) days after its receipt of the Offer Notice, the Company or such Affiliated Successor may proceed with the proposed issue or Transfer of the Offered Securities for which the Preemptive Rights Offer has not been accepted, free of any right on the part of such Holder under this Section 4.1.1 in respect thereof; provided, that no Issuing Transaction shall be effected more than two (2) months after the date of the Offer Notice and no such issuance or Transfer shall be effected at a price less than the price contained in the Offer Notice or on terms materially different from those contained in the Offer Notice.

4.1.2 **Exceptions to Preemptive Rights.** This Section 4.1 shall not apply to (i) issuances or sales of Common Stock or Common Stock Equivalents to employees, officers, and/or directors of the Company and/or any of its Subsidiaries pursuant to employee benefit or similar plans or arrangements of the Company and/or its Subsidiaries approved by the Board of Directors of the Company; provided, any such issuance or sale does not exceed, in the aggregate, fifteen percent (15%) of the Fully-Diluted Common Stock of the Company as of the date of such issuance or sale, (ii) issuances or sales of Common Stock or Common Stock Equivalents upon exercise of any Common Stock Equivalent which, when issued, was subject to or exempt from the preemptive rights

under this Section 4.1, (iii) securities distributed or set aside ratably to all holders of Common Stock and Common Stock Equivalents (or any class or series thereof) on a per share equivalent basis, (iv) issuances or sales of Common Stock or Common Stock Equivalents pursuant to a registered underwritten public offering, a merger of the Company or a Subsidiary of the Company into or with another entity or an acquisition by the Company or a Subsidiary of the Company of another business or corporation (a "Corporate Transaction"), (v) issuances of Common Stock by the Company in payment of all or any portion of the principal of, or interest or premium on, any indebtedness of the Company or any of its Subsidiaries, or (vi) issuances of up to five million (5,000,000) shares issued at a price of no less than $1.00 per share (the "Parts Distributors Shares") to certain automotive parts distributors to be determined by the Company (the "Parts Distributors"), of which 599,800 shares will be reserved for issuance to parts distributors that are members of the CARQUEST group; provided, however, that in the event, during the one-year period after the date hereof, the Company issues the Parts Distributor Shares to Parts Distributors, the Company shall issue to CCI, for such consideration as is specified in that certain Amended and Restated Formation Agreement dated as of May 31, 2000, among the Company and the Holders, such number of shares of Common Stock as is necessary to enable CCI to maintain a thirty-three and one-third percent (33 1/3%) ownership of the Company after giving effect to such issuance of the Parts Distributor Shares; provided, that CCI shall only be entitled to receive such additional shares of Common Stock with respect to the first 5,000,000 shares issued to such Parts Distributors. In the event of any issuances or sales of Common Stock or Common Stock Equivalents as a unit with any other security of the Company or its Subsidiaries, the preemptive rights under this Section 4.1 shall be applicable to the entire unit rather than only the Common Stock or Common Stock Equivalent included in the unit.

4.2    Restrictions on Transfer.    During the term of this Stockholders Agreement, no Holder may, either directly or indirectly, Transfer any Common Stock or Common Stock Equivalents, except as permitted by this Article 4. Any attempted Transfer that is prohibited by this Stockholders Agreement will be void ab initio and of no force and effect. Other than Transfers in accordance with Sections 4.4.2 and 4.5 hereof and any Qualified IPO consummated by the Company, each Holder, as a condition to the effectiveness of such Transfer, shall cause any proposed transferee of any Common Stock and/or Common Stock Equivalents or any interest therein held by it to agree, pursuant to a written agreement reasonably satisfactory to the Company, to take and hold such Common Stock subject to the provisions and upon the conditions specified in this Stockholders Agreement (unless such Person is a party to this Stockholders Agreement prior to such Transfer).

4.3    Prohibited Transfers. Subject to Section 4.4.3 hereof, for a period of three (3) years following the date hereof, no Holder shall Transfer any Common Stock or Common Stock Equivalents, unless the Company shall have consummated a Qualified IPO.

4.4    Right of First Offer. Subject to the further restrictions in Section 4.3 hereof, if, during the term of this Agreement, a Holder (a "Transferor") desires to Transfer for value any shares of Common Stock and/or Common Stock Equivalents (for

purposes of this Section 4.4, "shares") to any Person, the Transferor shall give written notice (the "Transferor's Notice") to the Company and the other Holders of such proposed sale or transfer. The Transferor's Notice shall (i) specify the number of shares to be transferred, the consideration to be received therefor, and the other material terms on which the Transferor proposes to transfer the shares, (ii) contain an undertaking to honor any Participation Offer (as defined in Section 4.4.2 below), which is made in accordance with the terms hereof, and (iii) contain the offer described in Section 4.4.1 herein.

4.4.1   Option Offers.   The Transferor shall offer to sell (the "First Option") all such shares to the Company at the same price per share and for consideration consisting of (x) cash equal to the amount of cash proposed to be paid and (y) if applicable, any cash or non-cash consideration proposed to be paid.   The decision whether or not the Company will accept the First Option shall be made by the Board of Directors of the Company and the Company shall give the Transferor written notice of such determination on or prior to the tenth (10) business day after receipt of the Transferor's Notice. If the Company (a) fails to notify the Transferor in writing on or prior to the tenth (10) business day after receipt of the Transferor's Notice that it elects to accept the First Option or (b) by written notice within such 10-day period rejects the First Option in whole or in part, the Transferor shall offer to sell (the "Second Option") the shares not to be so purchased to the other Holders (the "Option Holders") at the same price per share and for the same consideration specified in the Transferor's Notice; provided, however, that the Transferor shall not be obligated to offer such shares to any Holder who is not an Accredited Investor. The Option Holders may purchase the shares so offered in the proportions upon which they mutually agree, or, if they are unable to agree upon an allocation of such shares among themselves, then in proportion to the number of shares of Common Stock (without reference to the shares of Transferor so offered) owned by each such Option Holder who wishes to participate in the purchase of such shares pursuant to the Second Option. The Second Option may be accepted by one or more of such Option Holders by written notice delivered to the Transferor within twenty (20) days after receipt of the Transferor's Notice. Unless, through exercise of the First Option and/or the Second Option, all the securities proposed to be transferred in the Transferor's Notice are to be acquired by the Company and/or the Option Holders, the Transferor may transfer, subject to paragraph (b) below, all shares covered by the Transferor's Notice in accordance with the terms of such transfer set forth in the Transferor's Notice; provided, however, that such transfer must occur no later than seventy-five (75) days after the date the Transferor's Notice was received by the Company or five (5) days after the expiration or termination of any waiting period applicable to such transfer pursuant to the HSR Act, whichever is later.  If the First Option and/or the Second Option, as the case may be, is accepted in a manner such that all shares covered by the Transferor's Notice are to be purchased, the Transferor shall transfer all such shares (free of all liens and encumbrances except this Stockholders Agreement, all as reasonably determined by the Company) to the respective purchasers thereof within twenty (20) days after the date such offer is accepted by the Company and/or Option Holders, whichever is later, against delivery by the purchaser of the consideration payable to the Transferor as set forth in the Transferor's Notice; provided, that, if the HSR Act is applicable to the First Option or the Second Option, such date

shall be extended to the date which is five (5) business days after the date the applicable waiting period expires or is terminated.

4.4.2    Co-Sale Rights.    The Transferor's Notice delivered pursuant to Section 4.1.1 shall also state (the "Participation Offer") that, in lieu of exercising the Second Option, or if less than all the shares proposed to be sold by the Transferor are to be purchased as a result of the exercise of the First Option and/or the Second Option, each Option Holder may request to have included in the proposed transfer a portion of its Common Stock and (if Common Stock Equivalents are proposed to be transferred by the Transferor or if the proposed transferee otherwise consents) vested Common Stock Equivalents (on an as-converted or as-exercised basis) which represent the product of (i) the number of shares covered by the Transferor's Notice, times (ii) a fraction the numerator of which is the number of shares of Fully-Diluted Common Stock held by such Option Holder and the denominator of which is the aggregate number of all shares of Fully-Diluted Common Stock held by the Transferor and all Option Holders electing to accept the Participation Offer; provided, that, if the proposed consideration for such shares includes securities and such transaction is to be effected by a private placement to Accredited Investors, no Option Holder who is not an Accredited Investor shall have the right to be included in such proposed transfer.    The Participation Offer shall be conditioned upon the execution and delivery by each Option Holder that accepts the Participation Offer of all agreements and other documents as the Transferor is required to execute and deliver in connection with such proposed transfer.  If the First Option and/or Second Option is not exercised with respect to all the securities proposed to be transferred by the Transferor or, if the First Option is exercised with respect to all the securities proposed to be transferred by the Transferor, and any Option Holder shall accept the Participation Offer, the Transferor shall reduce, to the extent necessary, the number of shares of Common Stock or Common Stock Equivalents it otherwise would have sold in the proposed transfer so as to permit those Option Holders who have accepted the Participation Offer to sell the number of shares of Common Stock and/or Common Stock Equivalents, if applicable, that they are entitled to sell under this Section 4.4.2, and the Transferor and such Option Holders shall transfer the number of shares of Common Stock and/or, if applicable, Common Stock Equivalents specified in the Participation Offer to the proposed transferee in accordance with the terms of such Participation Offer.  Notwithstanding the foregoing, if the transferee refuses to purchase any Common Stock and/or Common Stock Equivalents, if applicable, proposed to be sold by each Option Holder that accepts the Participation Offer, the Transferor shall be prohibited from consummating the transfer in respect of which the Participation Offer was made.

4.4.3    Exceptions.    Section 4.3 and this Section 4.4 shall not apply to (i) any Corporate Transaction (as defined in Section 4.1.2(iv)); (ii) any Transfer of Common Stock or Common Stock Equivalents by a stockholder who is an individual to his spouse or direct descendants, to a trust for the benefit thereof, or to any 401(K) or other self-directed plan subject to the Internal Revenue Code of 1986, as amended, or successor statutes, for the benefit of such individual, or (iii) any Transfer by a Holder of shares of Common Stock and/or Common Stock Equivalents to an Affiliate of such Holder; provided, that any Affiliate having acquired Common Stock and/or Common Stock